## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**DAPHNE DERIS AND JESSICA**                                    **CIVIL ACTION**
**DERIS, INDIVIDUALLY AND ON**
**BEHALF OF THE ESTATE OF**
**WARREN DERIS**

**VERSUS**                                                      **NO:  12-1456**

**NEWELL NORMAND, ET AL.**                                      **SECTION: "S" (1)**

### ORDER AND REASONS

      **IT IS HEREBY ORDERED** that the Defendants' Motion for Summary Judgment (Doc.

#66) is **GRANTED**.  Plaintiffs' claims against Jefferson Parish Sheriff Newell Normand, and

Jefferson Parish Sheriff's Deputies Christopher Bassil, Jerry Petit, Christopher Cade, Shane Rivolo,

and Jon-Michael Norris under 42 U.S.C. §§ 1983 and 1988 are **DISMISSED WITH PREJUDICE**,

and plaintiff's claims against those defendants under Louisiana state law are **DISMISSED**

**WITHOUT PREJUDICE**.

### BACKGROUND

      This matter is before the court on a motion for summary judgment filed by defendants,

Jefferson Parish Sheriff Newell Normand, and Jefferson Parish Sheriff's Deputies Christopher

Bassil, Jerry Petit, Christopher Cade, Shane Rivolo, and Jon-Michael Norris.  Defendants argue that

the undisputed facts demonstrate that the deputies are entitled to qualified immunity, because under

precedent of the United States Court of Appeals for the Fifth Circuit, they did not violate Warren

Deris' Fourth Amendment right to be free from the use of excessive force.  Plaintiffs, Daphne Deris

and Jessica Deris, individually and on behalf of the estate of Warren Deris, argue that the deputies

are not entitled to qualified immunity because the "defendants' grossly negligent conduct was so

objectively unreasonable as to constitute an unreasonable seizure that ended in the use of excessive

force."  Specifically, they argue that the Jefferson Parish Sheriff's Department's lack of policies and training regarding hostage and barricaded subject situations resulted in the deputies' rushed approach, which escalated the situation, and lead to the use of force resulting in Warren Deris' death.

On July 5, 2011, Daphne Deris and her daughter, Jessica Deris, arrived home around 5:15 p.m., and found Warren Deris in the swimming pool.  Warren Deris was Daphne Deris' husband and Jessica Deris' father, but he did not live with his wife and daughter.  Jessica Deris was upset that her father was at the house, and after she helped her cancer-stricken mother settle into bed, she confronted her father to ask him for money to pay the household bills.  Warren Deris responded that he did not have any money, Jessica Deris told him to leave the hosue, and a fight ensued.  At some point, Warren Deris took Jessica Deris' and Daphne Deris' telephones, pulled Jessica Deris' hair, and armed himself with knives from the kitchen.  Jessica Deris snuck out of the house with her five-month-old son, and called the police from a neighbor's house.

At approximately 5:50 p.m. on July 5, 2011, the neighbor, Debbie Jeffries, called 911 to report a domestic disturbance at Jessica Deris' house.  Jeffries said:

> My neighbor just came over and she said her father's just gone crazy. He's got knives out of the drawers.  She's afraid.  She's over here crying.  Her mother's still in the house.  He was pulling her hair.  He didn't want her to get out of the house to come and call the police. He took her phones away.

Jeffries confirmed Warren Deris' identity, that he did have knives and would not let his wife out of the house, and that she did not know why he was doing this.  Then, Jessica Deris spoke to the 911 operator.  The operator asked Jessica Deris if she knew why her father was "doing all of this," and she replied:

2

No.  Well because he probably smoked crack last night.  He's a crack
addict.  And I asked him for money for the bills because he went to
work yesterday and he shows up empty handed.  He don't have no
money so I told him to get out.  I packed his stuff and he wouldn't
leave.  He wouldn't leave.  He kept banging on the windows saying
he was going to break the windows.  He was gonna do this, he was
gonna do that.

Jessica Deris then said "Can you please hurry?  My mom's in the house and he's got knives in his

hands."  She also confirmed that, although Warren Deris did not hit her, he pulled her hair and

threatened to kill her if she called the police.

The dispatcher stated over the police radio that a "male subject Warren" was at the address,

and "has gone crazy, has a 95-K (illegal carrying of a knife), and refusing to let his wife leave the

residence."  Deputies Cade, Petit, Rivolo and Norris responded that they were en route to the

location.  Sergeant Al West also responded.  The dispatcher then stated "[u]nits in route to Green

Acres advise, be advised, complainant asked the subject for money to pay bill and he went crazy,

he's holding his wife Daphne inside of the residence."  After Deputies Cade, Rivolo and Norris, and

an "unidentified male," responded that they were at the location, Sergeant West instructed them to

"establish contact, either by phone or verbal."

Deputy Cade was the first deputy on the scene, and he met Jessica Deris in the front yard.

Jessica Deris said that "her dad's gone nuts," and has a knife in his hand and will not let her mother

out of the house.  Deputy Cade asked Jessica Deris if the door was unlocked or if she had her key

so that the deputies could get inside.  Deputies Rivolo and Bassil arrived on the scene.  Deputy Cade

and Jessica Deris walked together to the side door under the carport.  Deputy Rivolo was walking

behind them and heard Jessica Deris say that her mother was in the back of the house, so he went

toward the back of the house.

Jessica Deris tried to open the door, but it was locked, so she banged on it and demanded to be let in.  Warren Deris came to the door and said "f– ya'll, I'm not going back to jail."  Deputy Cade asked him to allow them to come inside.  Warren Deris responded "f– ya'll, ya'll not coming in here no," and raised his hand to show them what appeared to be a black semi-automatic handgun.  In response, Deputy Cade drew his weapon and ordered Warren Deris to put the gun down and open the door.  Deputy Rivolo heard Deputy Cade say "drop the gun" and "immediately went right back to the door" where he observed Warren Deris at the door cursing and telling the deputies that he was not going to jail and not coming out.  Deputy Rivolo drew his weapon "to at least provide some cover" to Deputy Cade.

Deputy Norris arrived on the scene and heard Deputy Cade direct someone to "drop the gun" several times.  Deputy Pettit arrived and ran to the carport where the other deputies were telling Warren Deris to drop the weapon and open the door. Warren Deris said that he did not want to go to jail, and the deputies told him that they just wanted to talk.

Warren Deris stepped away from the door. Deputy Rivolo began kicking the door while Deputy Bassil held the storm door open. Deputy Norris and then Deputy Pettit attempted to assist with kicking the door down.  Deputies Cade, Rivolo, Pettit, and Bassil reported that they kicked the door to attempt to gain entry because they thought that Warren Deris was going to kill or harm his wife due to the threats they heard over dispatch and what Jessica Deris told Deputy Cade when he arrived at the scene.  Deputy Rivette arrived while Deputy Pettit was kicking the door.  He went around the carport to get a different position.

As Deputy Pettit kicked the door, Warren Deris returned to the door and told the deputies to stop kicking the door, and that he was going to kill them.  Then he raised up the shade and a black

4

handgun, pushed the gun through the door's glass and pointed it at Deputy Pettit.  A split-second later, Warren Deris moved the gun and pointed it at Deputy Rivolo.  The deputies told him to drop the gun, and then started firing.  Deputies Cade, Pettit, Norris, and Rivolo stated that they fired because they believed their lives were in danger.  They all said that the gun looked like a semi-automatic weapon.  Deputy Bassil also thought that Warren Deris "was gonna fire on the deputies" but did not shoot because he did not have a good angle, and was afraid he would hit one of the other deputies.  Deputy Rivette heard several people yelling for Warren Deris to drop the gun, and heard the gunshots while he was running back to the front of the carport.  He did not see the incident. Deputies Cade and Rivolo recall Jessica Deris yelling at her father, but they did not know what she was saying.  No deputy recalls Jessica Deris telling them that Warren Deris' gun was a BB gun.

        The police dispatch call log indicates that the shots were fired two minutes and thirty-three seconds after the first officer arrived on the scene.  After the shooting, Sergeant West arrived on the scene and advised the deputies involved to return to their cars and await further instruction.  The homicide division of the Jefferson Parish Sheriff's Office arrived and conducted an investigation. The deputies and Jessica Deris went to the homicide division's offices to give statements.  Daphne Deris gave a statement at her neighbor's house.

        In her statement, Jessica Deris said that, when the officers arrived, she told them that Warren Deris was probably in the back of the house in her mother's room.  She led the deputies to the side door.  Warren Deris came to the door and was "flashing a B.B. gun."  The deputies told him to come out and put down the gun.  Jessica Deris said that she told the deputies that it was not a real gun. Warren Deris told the deputies that they would have to kill him if they came in the house.  Then he banged the gun against the window, breaking it, and the police started shooting.  Jessica Deris said

that she thought that the deputies could have thought that Warren Deris was aiming at them when the glass broke.  She also said that although she told the deputies that the gun was fake, they could have thought it was real.  Jessica Deris also stated that she thought her father did this to commit suicide because "he knew ya'll were gonna shoot him. And he knew he was gonna die."

Daphne Deris said in her statement that she "[h]eard police saying open the door, open the door . . . open the door, and he's like you ain't f–ing coming in here, you're gonna have to kick the door in, you're gonna have to kill me you're gonna have to you know all this."  She also said that the BB gun that Warren Deris was holding "absolutely looks real," and she "kept it in her house for her own protection in case an intruder came in."  She thought that she "could at least intimidate [an intruder] and say I got my own gun."  Daphne Deris further stated that she thought "there was not an officer out there today, . . ., that made a mistake.  I don't, I don't this is what he wanted.  He wanted death by I don't what you call it, death by police."

Plaintiffs filed their complaint on June 7, 2012, and an amended complaint on March 25, 2013, bringing claims under 42 U.S.C. §§ 1983 and 1988[1], and Louisiana state law.  They allege that the deputies shot Warren Deris without probable cause, which constituted excessive force, cruel and unusual punishment, and a deprivation of due process in violation of his constitutional rights guaranteed by the Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States, and negligence and battery under Louisiana law.  Further, they allege that the deputies actions "leading up to the shooting of Warren Deris and the shooting itself were in violation of the standards, regulations, practices, and policies of the Jefferson Parish Sheriff's Office in that

---

[1]  Plaintiffs allege that the defendants are liable for attorneys' fees under 42 U.S.C. § 1988.  Because plaintiffs' claims for violations of Warren Deris' constitutional rights have been dismissed,  this claim is also DISMISSED WITH PREJUDICE.

additional steps should have been taken before attempting to enter the residence and resorting to deadly force under the circumstance."  Plaintiffs also allege that Sheriff Normand violated Warren Deris' constitutional rights by failing "to properly hire, train, and/or supervise [the] deputies, thus leading to the unjustified excessive force used against Warren Deris and the surrounding violations of policy that culminated in the shooting," and that Sheriff Normand acted negligently under Louisiana law by "failing to properly select, train, supervise and/or retain law enforcement personal," and failing "to have adequate policies and procedures to protect the civil rights of the public."

Defendants filed a motion for summary judgment seeking dismissal of plaintiffs' claims. They argue that the deputies did not violate Warren Deris' Fourth Amendment right to be free from excessive force, and that because there was no constitutional violation, Sheriff Normand cannot be held liable under Monell v. Dep't of Soc. Servs., 98 S.Ct. 2018 (1978).

## ANALYSIS

### A.      Summary Judgment Standard

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Amburgey v. Corhart Refractories Corp., 936 F.2d 805, 809 (5th Cir. 1991); FED. R. CIV. PROC. 56(c).  If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial.  Celeotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986).  The non-movant cannot satisfy the summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.  Little v. Liquid Air Corp., 37 F.3d 1069,

1075 (5th Cir. 1994) (en banc).  If the opposing party bears the burden of proof at trial, the moving

party does not have to submit evidentiary documents to properly support its motion, but need only

point out the absence of evidence supporting the essential elements of the opposing party's case.

Saunders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1991).

**B.     Plaintiffs' § 1983 Claims Against the Deputies**

     **1.  The Fourth Amendment**

The defendant deputies argue that the undisputed facts demonstrate that they are entitled to

qualified immunity regarding plaintiffs' excessive force claims brought under § 1983.

      **a.  Section 1983**

Section 1983 provides a remedy against "every person," who under color of state law,

deprives another of any rights secured by the Constitution and laws of the United States. 42 U.S.C.

§ 1983; Monell v. Dep't of Soc. Servs., 98 S.Ct. 2018 (1978).   Section 1983 is not itself a source

of substantive rights; it merely provides a method for vindicating federal rights conferred elsewhere.

Olabisiomotosho v. City of Hous., 185 F.3d 521, 525 n. 3 (5th Cir. 1999).

To pursue a claim under section 1983, a plaintiff must: (1) allege a violation of rights secured

by the Constitution or laws of the United States, and; (2) demonstrate that the alleged deprivation

was committed by a person acting under color of state law. Sw. Bell Tel., LP v. City of Hous., 529

F.3d 257, 260 (5th Cir. 2008); see also West v. Atkins, 108 S.Ct. 2250, 2255-54 (1988).

Plaintiffs alleged that the deputies violated Warren Deris' right to be free from excessive

force that is guaranteed by the Fourth Amendment of the Constitution of the United States.  They

also allege that the deputies were acting under the color of state law as deputies of the Jefferson

Parish Sheriff's Department when the incident occurred.  Therefore, plaintiffs have alleged a claim

under § 1983.  However, the deputies argue that they are entitled to qualified immunity on that claim.

### b. Qualified Immunity

"A qualified immunity defense serves to shield a government official from civil liability for damages based upon the performance of discretionary functions if the official's acts were objectively reasonable in light of then clearly established law." Atteberry v. Nocona Gen'l Hosp., 430 F.3d 245, 253 (5th Cir. 2005) (citation omitted).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 106 S.Ct. 1092, 1096 (1986). "The immunity inquiry is intended to reflect the understanding that 'reasonable mistakes can be made as to the legal constraints on particular police conduct.'" Pasco v. Knoblauch, 566 F.3d 572, 582 (5th Cir. 2009) (citation omitted).

"When a defendant invokes qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense." Club Retro, LLC v. Hilton, 568 F.3d. 181, 194 (5th Cir. 2009) (citing McClendon  v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002) (en banc)). "To discharge this burden, a plaintiff must satisfy a two-prong test.  First, he must claim that the defendants committed a constitutional violation under current law.  Second, he must claim that the defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of."  Atteberry, 430 F.3d at 253; see also Stokes v. Gann, 498 F.3d 483, 484 (5th Cir. 2007).  When the court is considering qualified immunity on a motion for summary judgment it "looks to the evidence before it." McClendon, 305 F.3d at 323 (quoting Behrens v. Pelletier, 116 S.Ct. 834, 840 (1996)).  The sequence of the two-prong analysis is not

9

mandatory, and courts may exercise discretion in deciding which of the two prongs should be addressed first. Pearson v. Callahan, 129 S.Ct. 808, 818 (2009).

### i. Constitutional Violation - Excessive Force

A plaintiff claiming that the defendants violated the Constitution of the United States by using excessive force must show "(1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." Manis v. Lawson, 585 F.3d 839, 843 (5th Cir. 2009) (quoting Ontiveros v. City of Rosenberg, Tex., 564 F.3d 379, 382 (5th Cir. 2009)).  Excessive force claims depend on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 109 S.Ct. 1865, 1872 (1989).  Not all of the foregoing Graham factors need "be present for an officer's actions to be reasonable; indeed, in the typical case, it is sufficient that the officer reasonably believed that the suspect posed a threat to the safety of the officer or others." Rockwell v. Brown, 664 F.3d 985, 992 (5th Cir. 2011).

"An officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a treat of serious harm to the officer or to others." Manis, 585 F.3d at 843 (citing Ontiveros, 564 F.3d at 382).  "Reasonableness in these circumstances 'must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation.'" Hathaway v. Bazany, 507 F.3d 312, 320-21 (5th Cir. 2007) (quoting Graham, 109 S.Ct. at 1872).  It is a question "of 'objective reasonableness,' not subjective intent, and an officer's conduct must be judged in light of the

circumstances confronting him, without the benefit of hindsight." <u>Manis</u>, 585 F.3d at 843 (citing

<u>Ontiveros</u>, 564 F.3d at 382-83).  "The excessive force inquiry is confined to whether the [officer or

another person] was in danger *at the moment of the threat* that resulted in the [officer's use of the

deadly force]." <u>Rockwell</u>, 664 F.3d at 991 (quoting <u>Bazan v. Hidalgo Cnty.</u>, 246 F.3d 481, 493 (5th

Cir. 2001)) (emphasis in original).

        In this case, when looking "at the moment of the threat that resulted in the officer's use of

deadly force," Deputies Cade, Norris, Rivolo and Pettit's shooting of Warren Deris was objectively

reasonable.  The defendant deputies' post-incident statements were all consistent.  Deputies Cade,

Norris, Rivolo, Pettit and Bassil all concurred that Warren Deris returned to the door while Deputy

Pettit was kicking it, pulled back the curtain, punched through the door's glass pane with a weapon

that appeared to be a black semi-automatic pistol, and pointed it at the deputies.[2]   Deputies Cade,

Norris, Rivolo and Pettit all stated that they fired their guns almost simultaneously because they

were in fear of their own lives or the lives of their fellow deputies.  Deputy Bassil stated that he was

also in fear of the other deputies' lives, but did not fire his weapon because he did not have a clear

shot.  Deputy Norris explained in his deposition:

>            He pulled the curtain up to the left.  This part I remember very
> clearly.  He pulled the curtain up to the left.  Stared for fractions of
> a second, not at specifically anybody, but just standing behind, and
> all three panes were intact at the time.
>
>                        *        *        *
>
>            And within, literally fractions of a second, wasn't very long,
> he pulls the gun up, this is before breaking the glass, you see him
> pulling the gun up and punch it through.  As far as how far it came
> out, I honestly, I wouldn't be able to give you in specific millimeters

---

[2] Deputy Rivette did not see the incident.

11

or what not.  But I do know it went out, partially came back in, like a punch and come back in.  It was protruding by some degree outside the door, not completely, not whole armed or anything like that.

\*       \*       \*

Initially, I'm assuming, because he had to maintain, get his bearing or what not, when it first came through the window, wasn't pointed at anyone specific.  Once it went through the window, to me at the time it appeared as if it went to Deputy Rivolo and then kind of quickly transitioned over to Deputy Pettit.

By the time it got to Deputy Pettit, we had opened fire.  We had no way of knowing whether this gun was real, fake, plastic or what not.  All we knew is it had enough weight to punch through a pane glass window.  It looked like a very, very real gun.  Matter of fact, at the time I believe, after the fact, during the incident, I remember seeing the gun barrel, thinking this is an immediate threat.  This is going to hurt.  After the fact, I thought in my mind's eye it was a Beretta 92-F.  That's what it looked like to me.

Deputy Norris remembered hearing Jessica Deris saying "Daddy, please no," but he did not hear her say that it was a BB gun.

Similarly, Deputy Pettit explained in his deposition:

The last time I kicked the door, the suspect came to the window, said back the f– off. Punched the gun through glass and pointed it at my head.

\*       \*       \*

Once he punched the glass, I saw three black dots. His two eyes and a gun barrel at my head.  I was waiting for the flash of the muzzle.

\*       \*       \*

I thought this guy is going to make me kill him.  As soon as he began going to the left, I got concerned for my other fellow deputies.  That's when I fired.

\*       \*       \*

12

I was in fear for somebody else's life.

[The officers fired] nearly all at the same time.   One loud
bang basically.

After reviewing all of the officers' statements and depositions, the statements and depositions of Daphne and Jessica Deris, and photographs of the BB gun Warren Deris had that day, the court finds that under the circumstances, the officers' reasonably feared for their lives at the moment they shot Warren Deris while he pointed at them with a weapon that appeared to be a black semi-automatic pistol.

Plaintiffs argue that the court must consider the defendant deputies' actions leading up to their shooting Warren Deris.   They contend that the defendant deputies failed to follow proper police procedure and unnecessarily escalated the situation by rushing to break down the door, which lead to their use of deadly force on Warren Deris.   In Rockwell, 664 F.3d at 988, Scott Rockwell's mother called the police seeking help for her bipolar, schizophrenic son who had threatened her, was exhibiting suicidal behavior and had locked himself in his room.   The police arrived, talked to Scott Rockwell through he bedroom door, and then broke down the door when they decided to arrest him. Id. at 989.   Scott Rockwell charged at the officers with two eight-inch knives, and the officers shot and killed him.   Id. at 989-90.   The plaintiffs in that case, relying on jurisprudence from other circuits, argued that the officers were not entitled to qualified immunity because the court did not consider the impropriety of the officers' forcing entry into Scott Rockwell's bedroom in determining the reasonableness of the officers' use of deadly force.   Id. at 992.   The United States Court of Appeals for the Fifth Circuit rejected this argument, stating:

It is well-established that the excessive force inquiry is confined to whether the officer or another person was in danger at the moment of the threat that resulted in the officer's use of deadly force.

13

> At the time of the shooting, Scott was engaged in an armed struggle with the officers, and therefore each of the officers had a reasonable belief that Scott posed an imminent risk of serious harm to the officers.  We need not look at any other moment in time.
>
> Accordingly, the officers' use of deadly force was objectively reasonable.

Id. at 992-93 (quotations omitted); see also Fraire v. City of Arlington, 957 F.2d 1268, 1276 (5th Cir. 1992) ("[R]egardless of what had transpired up until the shooting itself, [the suspect's] movements gave the officer reason to believe, at that moment, that there was a treat of physical harm"); Young v. City of Killeen, 775 F.2d 1349, 1353 (5th Cir. 1985) (finding that an officer's use of deadly force was reasonable even where the arrest was "negligently executed"); Ramirez v. Knoulton, 542 F.3d 124, 129 (5th Cir. 2008) (finding that "the magistrate judge improperly criticized [Officer Knoulton's failure to consider the use of non-lethal force or to employ a crisis negotiator").  Because the United States Court of Appeals for the Fifth Circuit has rejected the plaintiffs' suggested approach of considering the officers' conduct prior to the use of force, it will not be considered in this case, and the defendant deputies' use of deadly force on Warren Deris was objectively reasonable under this circuit's precedent.[3]  See id. Thus, the defendant deputies are entitled to qualified immunity regarding plaintiffs' Fourth Amendment claim for excessive force, and that claim is DISMISSED WITH PREJUDICE.

**2. The Fifth Amendment**

The Fifth Amendment of the Constitution of the United States provides for indictment by Grand Jury, and prohibits double jeopardy; compelled self-incrimination; the deprivation of life, liberty or property without due process; and, the taking of private property for public use without

---

[3] This ruling does not suggest that the events leading up to the shoot were unreasonable.

just compensation. U.S. CONST. amend. V.  The Fifth Amendment's guarantee of "due process" applies only to actions of the federal government, not to actions of individuals or of municipal governments. <u>Morin v. Caire</u>, 77 F.3d 116, 120 (5th Cir. 1996). Plaintiffs' complaint does not allege any facts that state a claim for a violation of Warren Deris' Fifth Amendment rights, and that claim is DISMISSED WITH PREJUDICE.

### 3.  The Eighth Amendment

The Eighth Amendment of the Constitution of the United States prohibits excessive bail, excessive fines, and cruel and unusual punishment.   U.S. CONST. amend. VIII. The Eighth Amendment does not apply until an individual is held in custody after a criminal conviction. <u>Austin v. Johnson</u>, 328 F.3d 204, 208 (5th Cir. 2003) (quoting <u>Johnson v. City of Dall.</u>, 61 F.3d 442, 444 (5th Cir. 1995)).  There is no allegation that the events at issue occurred while Warren Deris was in custody after a criminal conviction.  Thus, plaintiffs' complaint does not state a claim under the Eighth Amendment, and that claim is DISMISSED WITH PREJUDICE.

### 4.  The Fourteenth Amendment

Plaintiffs allege that the defendants violated Warren Deris' right to due process guaranteed by the Fourteenth Amendment to the Constitution of the Untied States.  A plaintiff does not have a "due process" claim under the Fourteenth Amendment if his claim is susceptible to analysis under a specific constitutional source. <u>See</u> <u>Petta v. Rivera</u>, 143 F.3d 895, 901 (5th Cir. 1998).  Because plaintiffs' excessive force claim is encompassed by the Fourth Amendment, they have not stated § 1983 claims for a violation of Warren Deris' right to "due process" guaranteed by the Fourteenth Amendments, and that claim is DISMISSED WITH PREJUDICE.

**C.      Plaintiffs' § 1983 Claims Against Sheriff Normand**

Plaintiffs' § 1983 claim against Sheriff Normand is governed by the Monell doctrine. See Woodard v. Andrus, 419 F.3d 348, 352 (5th Cir. 2005) (citing Monell v. Dep't of Soc. Serv., 98 S.Ct. 2018, 2035 n.55 (1978)). A local governmental body is liable for damages under § 1983 for constitutional violations resulting from official city policy.  See Monell, 98 S.Ct. at 2035-36.  A municipality or government body cannot be held vicariously liable under § 1983 for the constitutional torts of its employees or agents.  Id. at 2037.

To establish liability for a constitutional violation against the governmental bodies, the plaintiffs must prove three elements: (1) a policy maker; (2) an official policy; and (3) a violation of constitutional rights whose "moving force" is the policy or custom.  Monell, 98 S.Ct. at 2037. Section 1983 does not permit municipal liability predicated on respondeat superior. Bd. of Comm'rs of Bryan Cnty. v. Brown, 117 S.Ct. 1382, 1388 (1997), "Consequently, the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability. Piotrowski v. City of Hous., 237 F.3d 567, 578 (5th Cir. 2001).

As explained above, plaintiffs have not shown that the deputies violated Warren Deris' Fourth Amendment right to be free from the use of excessive force because the deputies' actions were objectively reasonable under the circumstances.  Therefore, Sheriff Normand is entitled to summary judgment on plaintiffs' § 1983 claim, and that claim is DISMISSED WITH PREJUDICE.

**D.      Plaintiffs' State Law Claims**

Plaintiffs assert claims under Louisiana law. Because plaintiffs' federal claims are hereby dismissed, it is appropriate for the court to decline to exercise supplemental jurisdiction over their

16

state law claims. <u>See</u> 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."); <u>see also</u> <u>Bass v. Parkwood Hosp.</u>, 180 F.3d 234, 246 (5th Cir.1999) ("When a court dismisses all federal claims before trial, the general rule is to dismiss any pendent claims.") Accordingly, plaintiffs' state law claims are DISMISSED WITHOUT PREJUDICE.

**CONCLUSION**

**IT IS HEREBY ORDERED** that the Defendants' Motion for Summary Judgment (Doc. #66) is **GRANTED**.  Plaintiffs' claims against Jefferson Parish Sheriff Newell Normand, and Jefferson Parish Sheriff's Deputies Christopher Bassil, Jerry Petit, Christopher Cade, Shane Rivolo, and Jon-Michael Norris under 42 U.S.C. §§ 1983 and 1988 are **DISMISSED WITH PREJUDICE**, and plaintiff's claims against those defendants under Louisiana state law are **DISMISSED WITHOUT PREJUDICE**.

New Orleans, Louisiana, this   __7th__   day of March, 2014.

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**

17
